### SHURTER et al. v. RICKER.
#### No. 6647.

Circuit Court of Appeals, Fifth Circuit.
Dec. 22, 1932.

Rehearing Denied Jan. 19, 1933.

W. A. Wright and Clifton H. Tupper, Jr., both of San Angelo, Tex., for appellants.

C. O. Harris, L. B. Harris and M. E. Sedberry, all of San Angelo, Tex., for appellee.

Before BRYAN, SIBLEY, and HUTCH-ESON, Circuit Judges.

BRYAN, Circuit Judge.

On August 18, 1931, appellee, Rupert P. Ricker, brought suit against appellants, Alice B. Shurter and E. D. Shurter, her husband, to recover judgment for $10,000 as for money lent on March 14, 1927; and in aid of his suit he caused a writ of attachment to be levied on three whole sections and two half-sections of land in Texas, of which at that time Mrs. Shurter was the record owner. The issues raised by the pleadings were: First, whether the contract sued on, assuming that it existed, was governed by the laws of Texas or the laws of New York. If it was a Texas contract, the suit at once fails, regardless of any other question involved in it, because under the laws of that state. it was unenforceable, since Mrs. Shurter, the alleged debtor, was a married woman. Texas Revised Civil Statutes. (1925) art. 4623. Appellee concedes this, but contends that the proof disclosed a New York contract, in which state a married woman is undoubtedly liable to the full extent that she would be if she were a feme sole. Chemical National Bank v. Kellogg, 183 N. Y. 92, 75 N. E. 1103, 2 L. R. A. (N. S.) 299, 111 Am. St. Rep. 717, 5 Ann. Cas. 158. E. D. Shurter, the husband, was not shown to be liable for the alleged debt. His only interest as a party is that, after the attachment was levied, his wife conveyed the land to him. Second, whether, on the one hand, the transaction relied on by appellee in reality constituted a loan as he claims, or, on the other, only a gift, or at least a repayment or return of money previously advanced by appellants to appellee. Third,

whether, if a debt was created in the first place, that debt was taken out of the bar of the statute of limitations, which admittedly had run before suit, by the acknowledgment of Mrs. Shurter in writing. At the close of the evidence both parties moved for a directed verdict. The district judge, in response to those motions, held that the transaction was governed by the law of New York; that a debt was originally created, which, though it had been barred by the statute of limitations, was revived by sufficient acknowledgments in writing signed by Mrs. Shurter, and, so holding, directed a verdict against Mrs. Shurter for the amount involved with interest; entered judgment in favor of Shurter, but held that the land which he claimed to own, but which was seized under the writ of attachment, was subject to be sold in satisfaction of the judgment.

At the time suit was brought appellee was a citizen of the state of Texas and appellants were citizens of the state of New York. On January 26, 1927, Mrs. Shurter wrote a letter to Ricker which in part is as follows: "Will you lend me, by April 15, for an indefinite period, ten thousand dollars without interest, without any security whatsoever, without any promise to pay, and without hope of reward? I am asking this on my own initiative and without the knowledge of anyone else. I am asking it with more anxiety in my mind and more hope in my heart than I can express, and the receipt of it would mean more to me than any words on paper can tell you."

On March 12, 1927, Ricker replied by telegram that he had just received that letter, and authorized her to make draft for the amount of money she requested. On March 14, 1927, Mrs. Shurter forwarded a draft for that amount, and it was paid by Ricker. The letter was mailed at Mrs. Shurter's place of residence in New York, and delivered as addressed to Ricker in Texas; and his reply telegram was sent from his place of residence in Texas, and delivered to her, as it was intended to be, at her residence in New York. For more than 20 years prior to 1926, when they moved to New York, appellants lived in Texas, and during practically all of that time the husband, Dr. E. D. Shurter, was a professor in the University of Texas at Austin. They became acquainted with appellee in 1914, while he was a student at the University. Soon after that he stated to them that he would have to give up his studies because of a lack of funds. Appellants talked the matter over with each other, and decided to

advance the money necessary for appellee to complete his education; and they did so. Appellee himself says that appellants treated him as though he were their son, although he questioned the total amount of the advances, and claimed that in 1922, after he had begun to make money, he included in a settlement with them of some business transactions an amount equal to that which they had given him. Mrs. Shurter testified that she kept an account of the money she and her husband had paid out for Ricker's personal expenses, and from her testimony it appears that between the years 1914 and 1921 she had let him have from time to time amounts which aggregated between four and five thousand dollars. She denied that any of this money had been returned, saying that a return was not exacted; that appellee had said that, though he would not give a note, if he ever became able he would return the money he had received. The district judge found as a fact that none of the money so advanced had ever been returned. In addition to the money which appellants let appellee have, they gave him a half-section of land upon the occasion of his graduation in 1915. By 1922 Mrs. Shurter had bought and paid for Ricker's interest in the land they had given him, and also for three sections and a half of other land. This is the land which was seized under the writ of attachment. It is adjacent to other land owned by Ricker's father, and the whole forms a body of 18 sections. By the time Mrs. Shurter asked for the $10,000 involved in this suit, Ricker had become prosperous, but the Shurters were in straitened circumstances; they had to depend for the most part upon the income derived from leases of the Texas land for grazing purposes, which brought them in at least $900 a year. Some time later they executed oil leases from which they derived an additional income of $500 a year. They were living in a house without plumbing and with them lived Dr. Shurter's aged and invalid sister. Mrs. Shurter testified that at the time she asked Ricker for the $10,000 she understood he was a millionaire; that Ricker's mother had written to her a few days before that, inquiring whether she and Dr. Shurter would sell their ranch, stating that, if they would, her son would buy it; that she replied that the ranch "was a bank at our backs," but if they ever did sell it they wanted the Ricker family to have it as they were friends; that when she wrote for the $10,000 she did not consider that she was asking for a loan, but for a return of favors; that Ricker had said that

he would pay when he could, and she thought the time had come when he could pay; and that she never would have considered asking for a loan. She further testified that, after she received the money, she told Ricker that she and Dr. Shurter were "reciprocating" in their wills, and that they had executed wills leaving him $15,000 and an interest in the mineral rights on their ranch; but that the wills were destroyed in 1931, because Ricker was insisting that he had only made a loan, and was demanding payment and either that the ranch be sold and that he be paid out of the proceeds, or that it be put up as security. Ricker testified that in 1927 he was worth $200,000 or perhaps $300,000, that by 1930 he was $75,000 in debt. The letters relied on as being sufficient to take the alleged debt out of the bar of the statute of limitations will now be stated. On July 1, 1930, Mrs. Shurter wrote Ricker stating that there was no chance of sending him what he wanted, but that she and Dr. Shurter would help if they could. On November 22, 1930, Ricker wrote asking Mrs. Shurter whether she had made any effort to raise some money as she had promised to do. On November 28th following, Mrs. Shurter wrote Ricker that the delay in replying was due to a frail hope which had not materialized; that silence had not meant lack of interest nor lack of earnest endeavor; that she thought once good luck was on the way, but had been disappointed. She then said that she would voluntarily and gladly help if it were possible. She repeated several times that she had never made any promises, but that she had plans which could not be carried out then or ever unless she were left undisturbed and unharrassed by Ricker's demands to turn things to meet his personal exigencies; that Ricker knew his situation, but did not know hers, nor what her situation held of "frustrated hopes, keen anxieties, bitter disappointments, of the past as well as of the present." She concluded by saying that promises were not necessary, but if the opportunity came it would be her desire and pleasure to help without reminder by any one else. On May 29, 1931, Ricker wrote referring to the $10,000 as a loan, saying that she had refused to help him by giving a note which he could use as an asset; and asking if she would not be decent enough to help him and to acknowledge the debt to his bankers. On June 4th, Mrs. Shurter wrote:

"I am sorry about everything. Sorry for the situation and all that it concerns or touches. Sorry that your estimate is as it is. Sorry and most deeply and sincerely regretful that I can be of no assistance at this

time. If I were to write at length the letter would be but a repetition of what I have already written. I can add nothing to that.

"With reference to your suggested methods of rendering assistance. I can only say as I have repeatedly said in former communications: 'I cannot sign any papers.'"

■ We agree with the district judge that the alleged contract was entered into in New York, and therefore would not be rendered invalid by reason of the fact that Mrs. Shurter was a married woman. Her request for the money was by letter which she sent to Texas. If Ricker's reply also had been by letter, it could be asserted with more reason that the alleged contract was entered into in Texas, because then he would have replied by the agency which she had selected. But when he selected the telegraph company as his agent the legal effect was that he agreed in New York to comply with her request. Under these circumstances the transaction must be held to have taken place in New York. Dickey v. Hurd (C. C. A.) 33 F.(2d) 415; Lucas v. Western Union Telegraph Co., 131 Iowa, 669, 109 N. W. 191, 6 L. R. A. (N. S.) 1016. This is not a case where the parties had in contemplation that their rights were to be determined by the law of either state, as was the case in Pritchard v. Norton, 106 U. S. 124, 1 S. Ct. 102, 27 L. Ed. 104. The circumstance that the draft was paid in Texas is without importance, and has no legal significance. Under appellee's theory the rights of the parties had already become fixed by his acceptance of Mrs. Shurter's offer to pay. The draft was used as a mere method of transferring money from one place to another; it is not made the basis of the suit, but is only used as evidence that Mrs. Shurter received the money. If it were undisputed that a gift was made of the amount in dispute, surely it would not be contended that the transfer of money by draft created any liability.

We are of opinion that Mrs. Shurter's letter of January 26, 1927, viewed in the light of the circumstances which preceded it, should not be construed as a request for a loan, or as containing a promise of payment. That letter standing alone might well be held to be a binding obligation upon her. It is true that she uses the word "lend," and that the expression "without any promise to pay" might be explained away on the theory that she was averse to giving a note. But when we take into consideration the intimate friendship that had existed for so long between Mrs. Shurter and her husband on the one side and Ricker on the other; the moral, if not legal, obligation on Ricker's part to repay the money which had been advanced to him; their poverty and his affluence; their need and his ability to help; a new light is thrown on the meaning of the letter. Under these circumstances too much emphasis ought not to be placed on the single word "lend," nor too little on the other words in the same sentence, "without interest, without any security whatsoever, without any promise to pay, and without hope of reward." Mrs. Shurter kept an account of the money she had advanced to Ricker during and after his college career, and, although neither she nor he considered it a loan, yet he promised that he would repay her if he ever became able to do so. At the time she asked him for the money he was amply able to make his promise good, and she and her husband were sorely in need of financial assistance. The amount she asked for was not much larger than the aggregate of amounts she had given him, with interest added, and was perhaps no more than she would have been entitled to if he paid her for the half-section of land. This is a matter that ought not to be lost sight of in seeking a solution of the question whether she was asking for a loan, and was making a promise to pay. She was not begging, or even asking for payment of a debt; but rather was requesting a reciprocation of favors, with the intention of making him the ultimate gainer by remembering him in her will.

■ Assuming however that originally there was a loan and an implied promise to pay, as clearly there was no express promise, it becomes material to consider whether the correspondence between the parties, which occurred in 1931, discloses that Mrs. Shurter signed an acknowledgment in writing which was sufficient to revive the cause of action that admittedly had become barred by the statute of limitations. The general rule is that such an acknowledgment should contain an unqualified and direct admission of a previous debt and express a willingness to pay it. Bell v. Morrison, 1 Pet. 351, 7 L. Ed. 174; Shepherd v. Thompson, 122 U. S. 231, 7 S. Ct. 1229, 30 L. Ed. 1156; Williston on Contracts, § 170. And this rule prevails in New York as well as in Texas. Connecticut Trust Co. v. Wead, 172 N. Y. 497, 65 N. E. 261, 92 Am. St. Rep. 756; Krueger v. Krueger, 76 Tex. 178, 12 S. W. 1004, 7 L. R. A. 72. It is to be remembered that when Mrs. Shurter stated repeatedly that she would not sign a note or give security she

was being asked by Ricker for a note and for security. Stress is laid on the fact that she often says that she would help if she could in response to Ricker's appeals for the help that he could derive from a note. It would be most unfair to single out a word or phrase and ignore the context. A careful examination of these letters, relied on to constitute a new promise, convinces us that Mrs. Shurter never intended to, and never did, acknowledge that she owed a debt or express a willingness to pay it. The most that can be said is that she expressed a desire to assist Ricker in his difficulties. In all of her letters she was at pains to make it plain that she would not assume an obligation to pay during her lifetime, but that she and her husband had made provision in their wills which would more than compensate him after their deaths for the money he had let them have during the period of their dire need. We are of opinion that the district judge should have directed a verdict for appellants.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

SIBLEY, Circuit Judge (concurring).

I think it doubtful whether the original transaction was under New York or Texas law, but that it is unnecessary to decide the question. I concur in all else.